UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

GILES MANLEY,

                 Petitioner,

    v.

WARDEN; DIRECTOR OF NEVADA DEPARTMENT OF CORRECTIONS, et al.,

                Respondents.

Case No. 3:11-cv-00354-HDM-WGC

ORDER

This is a counseled petition for writ of habeas corpus pursuant to 28 U.S.C § 2254 filed by Nevada state prisoner Giles Manley. (ECF No. 62). The second amended petition comes before the court for consideration of the surviving claims.

**I. Background**

On May 8, 2002, 22-year-old Isaac Perez, an elementary school custodian, was forced from the school where he was working into his own car by then 16-year-old Giles Manley. With Manley in the back seat, Perez drove. As he approached a traffic stop that was being conducted by Nevada Highway Patrol Trooper Guy Davis, Perez slowly drove his car into the stopped vehicle. Manley shot Perez in the head, neck and upper back five times, killing him, exited the left rear of the vehicle, fired a shot at Davis, hitting Davis in the foot, and fled.

1

Nearby, Manley found a Chevy Tahoe that was occupied by Heriberto Casas, Casas' wife and their infant child. Pointing the gun at Casas' head, Manley ordered Casas to move over to the passenger seat. Casas pleaded with Manley not to shoot and, as he did so, was able to exit the car. Casas' wife grabbed their child and exited the vehicle at the same time. Pointing the gun at Casas' wife and then back to Casas, Manley ordered Casas back into the car. Instead of complying, Casas gave Manley the keys to the car and he and his wife ran.

Manley took off in the Chevy and was on the lam for several hours before he was located by law enforcement. Manley then led officers on a high-speed chase through the streets of Las Vegas, a chase that ended only after Manley entered the intersection of Vegas Drive and Decatur against a red light, going upwards of 75 miles per hour, and crashed the Chevy into a car driven by Patrick Melia. (Exs. 2 & 3).[1] Melia was pronounced dead at the scene, and Manley was taken into custody directly from the wreckage.

The State charged Manley in a twelve-count indictment that included two counts of murder with use of a deadly weapon, one count of attempt murder with use of a deadly weapon, three counts of attempt first-degree kidnapping with use of a deadly weapon, one count of first-degree kidnapping with use of a deadly weapon, and several other related charges. (Ex. 5). The State also filed a notice of intent to seek death penalty. (Ex. 7).

---

[1] The exhibits cited in this order, comprising the relevant state court record, are located at ECF Nos. 31-34, 41, 49, 56, 63 and 64. The court would note that although exhibits also appear at ECF No. 35, the petitioner filed a notice of corrected image for the exhibits therein. The corrected images are located at ECF No. 41.

Manley's appointed attorneys, Joseph Abood and Nancy Lemcke, had Manley evaluated for competency by Dr. John Paglini. Dr. Paglini deemed Manley competent to stand trial and assist in his defense, but recommended further evaluation – specifically a neuropsychological evaluation to determine whether Manley had suffered any soft tissue damage in the crash ending his crime spree and a complete psychological evaluation. (Ex. 99).

Abood and Lemcke then engaged Dr. Gregory Brown to determine whether Manley suffered from mental retardation or had a psychiatric diagnosis. (Ex. 100). Dr. Brown concluded that Manley had an IQ of 80 and explained that, because "Full Scale IQ of 70 or lower is indicative of mental retardation," Manley was "in the range of borderline intellectual functioning just above mental retardation but not into the mental retardation level." (*Id.* at 6).[2] Dr. Brown also found Manley was dependent on marijuana, was experiencing high stress levels, and had a GAF in the 70 to 80 range but noted no other psychiatric diagnoses. (*Id.*)

The defense filed a motion "to Preclude the State From Seeking the Death Penalty Against a Mentally Handicapped Juvenile." (Ex. 15). The motion asserted that in addition to borderline intellectual functioning, Manley had poor coordination, several disrupted school experiences, behavior problems, a history of depressed and withdrawn moods, and "almost certainly . . . Fetal Alcohol Syndrome" based on his mother's admission that she used alcohol, marijuana, cocaine and LSD during her first trimester of pregnancy and numerous times after. (*Id.* at 3).[3]   The court denied

---

[2] Citation is to ECF page number at the top of the page.
[3] Citation is to original page of document.

the motion. (Exs. 17 & 18). Thereafter, Manley accepted an offer in which he agreed to plead guilty to all counts and accept the maximum sentence on each count in exchange for the death penalty being taken off the table. (Exs. 19 & 20).

At the change of plea hearing, Abood set forth the terms of the parties' agreement. (Ex. 20 (Tr. 2)). Before canvassing Manley, the court asked about the negotiations, stating in particular that it "want[ed] to be assured that Mr. Manley knows what he is doing, given his age, and how many times [counsel] talked to him, did his family talk to him." (Ex. 20 (Tr. 2-3)). Abood explained what occurred after the motion to dismiss the death penalty was denied:

> [T]he question then became what would be the likelihood of the State getting the death penalty in this case? It was our reason and judgment that it was a very good likelihood. So, obviously, faced with a situation like that, Mr. Manley has determined that it would be in his best interest to plead guilty pursuant to this guilty plea agreement in order to avoid the death penalty.

(*Id.* at 3). Abood stated that he and Lemcke discussed the case and the plea with Manley and his family many times, that they went over the plea agreement very carefully with Manley and explained to Manley his rights, that they both felt it was in Manley's best interest to plead, and that they believed Manley felt the same way and that he understood the nature of the plea agreement. (*Id.* at 3-5).

The court then asked Manley his name and age, which Manley answered, and read each of the charges before asking if Manley understood them. Manley replied, "Yes." (*Id.* at 6). Asked how he pled, Manley responded, "Guilty." (*Id.*) Asked if his plea was free and voluntary, Manley stated, "Yeah." (*Id.*) The court asked Manley if he had heard the negotiations as set forth by counsel and

4

whether that was his understanding of the plea agreement, to which Manley responded, "Yeah." (*Id.*) In response to further questions, Manley indicated he had gone over the agreement with counsel and his mom, and that he had read, understood and signed the agreement. (*Id.* at 6-7). The court read each charge in full and asked Manley if he committed that crime, and to each Manley responded yes. (*Id.* at 7-13). The court then accepted the plea as having been entered freely and voluntarily. (*Id.* at 13-14).

Less than two months later, at his sentencing hearing, Manley told the court he was not ready to proceed because he wanted to withdraw his plea and go to trial. (Ex. 21 (Tr. 4)). Abood represented to the court that Manley had made a similar statement to him and that, based on their discussions, Abood saw no basis for moving to withdraw the plea. (*Id.* at 5-6). On the grounds that the court saw nothing wrong with plea agreement and defense counsel did not believe a motion to withdraw was appropriate, the court denied the defendant's oral motion and proceeded with sentencing. (*Id.* at 6 *et seq.*). Manley was sentenced, pursuant to the plea agreement, to the statutory maximum term of incarceration on each count, all counts consecutive, including life without the possibility of parole on each of the murder counts. (Ex. 23).

The next day, Manley's mother submitted a motion for withdrawal of counsel on Manley's behalf, asserting that defense counsel

> led the Defendant to believe that he would be able to withdraw his Plea Agreement if and when the Supreme Court passed the law that the death penalty cannot be sought against a juvenile [but that o]nce the Plea Agreement was signed Defendant was told that he would not be able to withdraw his guilty plea.

5

(Ex. 22). The court granted the motion to withdraw and appointed new counsel for purposes of appeal. (Ex. 24). At the hearing appointing new counsel, Manley again asked to withdraw plea. The court indicated the request had been denied and was a matter for appeal. (*Id.*)

On direct appeal, the Nevada Supreme Court affirmed the denial of Manley's motion to withdraw plea. (Ex. 35).

Manley then filed a state postconviction petition in which he argued that he pled guilty on the false promise that he would be allowed to withdraw his plea if the law were to change. (Exs. 37 & 39). Without appointing counsel or conducting an evidentiary hearing, the trial court denied relief. (Ex. 43). The Nevada Supreme Court reversed and remanded for both an evidentiary hearing and appointment of counsel. (Ex. 51).

On remand, appointed counsel filed an amended petition and, after the evidentiary hearing, a second amended petition. (Exs. 53 & 55). Before the evidentiary hearing began, the State believed that Abood would testify that he *had* advised Manley that he could withdraw his plea if the law were changed to bar the execution of minors. (Ex. 54 (Tr. 3-4)).

When he took the stand, after he had reviewed his notes in his file, Abood testified, under oath, that he had made no such promise. According to Abood, he and Manley had discussed that the law might someday change to abolish the execution of juveniles. Abood testified that he told Manley that if this were to happen, Manley could ask that his plea be withdrawn. But he denied telling Manley the plea could definitely be withdrawn and said that in fact he told Manley there were no guarantees such a request would

be granted. (*Id.* at 13, 15-16, 21-22). Abood did not recall discussing the likelihood that a motion to withdraw plea would be granted, however. (*Id.* at 25).

Abood further testified that based on the facts of the case and Manley's juvenile history, he believed there was a substantial likelihood the death penalty would be imposed. (*Id.* at 9-10). Manley also understood he was a likely candidate for the death penalty. (*Id.* at 11-12). As such, Abood's primary goal became saving Manley's life. (*Id.* at 27-28). Abood explained that their intent in pleading

> was to put [Manley] in the best position possible to at least be able to raise the issue that he entered his plea based on a fear of receiving the death penalty, and if the death penalty were ever abolished in the future, he would be in a position to do exactly what he's doing right now, and that is to request that his plea be withdrawn based on a change in the law. And we made no secret about that. We made it clear that we wanted him to be at least in the position that he could be, at least request that his plea be withdrawn.

(*Id.* at 13).

Lemcke also testified. She agreed that their intent was to put Manley in the best position to obtain postconviction relief, whether he went to trial or plea, though she could not remember the specifics of what she or Abood said to Manley in their conversations. (*Id.* at 48-49). She also did not recall discussing the likelihood of success on a motion to withdraw the plea with Manley. (*Id.* at 51). The court then asked:

> There's a lot of difference in telling a client, listen, if the Supreme Court and Roper says that you're not allowed to execute juveniles, we tell you right now that you can withdraw your plea to this case, as opposed to saying, listen, if the Supreme Court comes down, then you could request or ask but there's no guarantees, you could ask to withdraw your plea. There's a little

7

difference that the Court sees. Could you enlighten the Court has [sic] to what happened here?

(*Id.* at 59). Lemcke responded: "I cannot imagine that either myself or Mr. Abood under any circumstance would say definitely you can do this just based on – we guarantee you as your lawyers that you will be able to withdraw your plea. That representation I cannot imagine would ever have been made." (*Id.* at 59-60). Lemcke also testified that she went through the plea agreement carefully with Manley and asked him to restate things in his own words so she knew he understood it. (*Id.* at 50).

Finally, the DA assigned to Manley's case, Christopher Lalli, testified. Lalli agreed that based on the circumstances of the case, and Manley's background which included committing sexual offenses on his younger sisters as a juvenile, that he believed Manley was likely to be sentenced to death. (*Id.* at 64-65). But he testified that he was willing to not seek the death penalty in light of Manley's dysfunctional childhood and youth and on the assurance that Manley would "never ever be released from custody." (*Id.* at 66). Lalli acknowledged that he and Abood had conversations about Manley seeking to withdraw his plea if the law were to change, but he stated he "absolutely did not" agree that Manley could withdraw his plea if the law changed and "would not have agreed to anything like that." (*Id.* at 67).

After the evidence was submitted, Manley's postconviction counsel told the court that Abood's testimony "absolutely shocked" him as it was totally contrary to what Abood said he was going to say. (*Id.* at 71).

The court continued the hearing for further argument, during which counsel for the State again affirmed that based on a

8

conversation with Abood a couple weeks before the hearing, "it was [his] understanding . . . that [Abood] would testify that he had advised Mr. Manley that he could withdraw his plea if the law was changed, that was my understanding, that was Mr. Goldstein's understanding." (Ex. 57 (Tr. 5)). But, the State's attorney continued:

> I will say on Mr. Abood's behalf that I know from talking with him the morning of the hearing before we came in court that he reviewed the files after those conversations with Mr. Goldstein and myself. Now, whether his review of the file jogged his memory and caused him to testify differently, or whether he changed his testimony for some other reason, I don't know but Ms. Lemke [sic] and Mr. Lally's [sic] testimony was totally consistent with the testimony that Mr. Abood gave at the hearing.

(*Id.* at 5-6). Postconviction counsel also submitted a sworn affidavit stating that Abood had "unequivocally stated that he did in fact advise Manley that he would be able to withdraw his plea" if the State of Nevada abolished the death penalty for juvenile offenders. (Ex. 55 at 11-12). He further stated: "I felt there was absolutely no ambiguity in Mr. Abood's words and I was utterly certain that Mr. Abood was telling me had had advised Mr. Manley accordingly." (*Id.* at 12).

The trial court found Abood credible that he did not promise Manley he could withdraw his plea and denied Manley's petition. (Ex. 58). The Nevada Supreme Court affirmed. (Ex. 65).

Thereafter, Manley pursued another state court postconviction petition, which was dismissed as procedurally barred. (Exs. 71 & 80). The Nevada Supreme Court affirmed. (Ex. 86).

In May 2011, Manley initiated the instant federal habeas action. Counsel was appointed, and in December 2011, had Manley

evaluated by Dr. Antolin Llorente, a licensed psychologist and clinical neuropsychologist. Like Dr. Brown earlier found, Dr. Llorente concluded that Manley functioned in the borderline category just above mental retardation. But, Dr. Llorente concluded, given his cognitive deficits, substance abuse, history of mental illness, lack of family support, and likely organic brain damage, Manley could not have understood the plea agreement or the consequences of his plea. (Ex. 101 at 24-25).

Dr. Llorente's opinion was included in a third petition filed with the state courts during the pendency of this action. (Ex. 88). The trial court dismissed that petition as procedurally barred, and the Nevada Supreme Court affirmed. (Exs. 139 & 147).

The surviving claims of the second amended petition are now before this court for either merits review or, in one case, for a determination as to whether Manley's procedural default can be excused.

**II. Standard**

A. Merits

28 U.S.C. § 2254(d) provides the legal standards for this Court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the      State        court proceeding.

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted.)

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Andrade*, 538 U.S. 63 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of

28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.

12

*Cullen*, 563 U.S. at 181.  The state courts' decisions on the merits are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, - U.S. -, 135 S. Ct. 2187, 2208 (2015).

B. Procedural Default

A procedural default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it.  *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488.  For cause to exist, the external impediment must have prevented the petitioner from raising the claim.  *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension."  *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

**III. Analysis**

A. Ground 1(A)

In Ground 1(A), Manley asserts that his plea was not knowing, intelligent and voluntary, in violation of his Fifth Amendment due process rights. (ECF No. 62 at 10).

13

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent and voluntary. *Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). "The voluntariness of [a petitioner's] guilty plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Those circumstances include "the subjective state of mind of the defendant . . . ." *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986).

Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated:

> (A) plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (en banc), *rev'd on other grounds*, 356 U.S. 26 (1958)); *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the "longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"); *Allen v. Quinn*, 383 Fed. App'x 679, 680 (9th Cir. 2010) ("Under Supreme Court precedent, a plea is voluntary so long as it is entered by one fully aware of the direct consequences, and not induced by threats, misrepresentation, or improper promises.").

14

In *Blackledge v. Allison*, 431 U.S. 63 (1977), the Supreme Court addressed the evidentiary weight of the record of a plea proceeding when the plea is subsequently subject to a collateral challenge. While noting that the defendant's representations at the time of his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his plea, the court stated that, nonetheless, the defendant's representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74; *see also Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012); *Little v. Crawford*, 449 F.3d 1075, 1081 (9th Cir. 2006).

"A habeas petitioner bears the burden of establishing that his guilty plea was not voluntary and knowing." *Little*, 449 F.3d at 1080.

On direct appeal, the Nevada Supreme Court found Manley's plea was knowing, voluntary and intelligent:

> The record before this court belies Manley's claim that the district court failed to ensure his plea was entered voluntarily and knowingly. . . . In the written plea agreement, Manley acknowledged that he agreed to plead guilty, understood the consequences of his plea, understood the rights and privileges he waived by pleading guilty, and that he voluntarily signed the agreement after consulting with counsel. During the district court's plea canvass, Manley's trial counsel, Joseph Abood, discussed the sequence of events leading to Manley's decision to enter a plea agreement. Abood stated that he and co-counsel spoke extensively with Manley, shared his discovery with him, and answered his questions. Abood also stated that he had thoroughly reviewed the written plea agreement with Manley, explaining to Manley his rights, the possible penalties, and the specifics of each crime. Manley acknowledged that he read and understood the plea agreement, he went over the plea agreement with counsel, he understood the

15

charges against him, and that he freely and voluntarily entered his guilty plea. Before accepting Manley's plea, the district court read each count on the amended indictment and Manley acknowledged that each count was correct. Based on the totality of the circumstances, we conclude that Manley's guilty plea agreement was entered voluntarily, knowingly, and intelligently.

(Ex. 35 at 5).

Manley argues that the state court's conclusion was objectively unreasonable. He asserts that his plea was not knowing, voluntary and intelligent because he did not understand the consequences of the plea, and he asserts he did not understand the consequences because (1) the plea canvass was infirm in light of his severe cognitive limitations, and (2) he pled based on an improper, and false, promise.

i. Ground 1(A)(1)

Manley argues that the court did not ask enough questions to confirm that he understood the agreement and the consequences of his plea, especially given that he was a juvenile with severe cognitive defects. (ECF No. 62 at 12). Specifically, he argues, the court directed most of its questions to his attorney, rather than to Manley himself, and the few questions directed to Manley were insufficient to establish he truly understood the agreement. (*Id.* at 12-14). He argues that Nevada Supreme Court did not consider the impact of his cognitive limitations in reaching its conclusion, and that its conclusion that his plea was knowing and voluntary is therefore objectively unreasonable.

There is "no fixed colloquy, no set of sequence or number of questions and answers, no minimum length of hearing, no Talismanic language that the judge is required to use." *Stewart v. Peters*, 958 F.2d 1379, 1384 (7th Cir. 1992); *see also Zepeda v. Figueroa*,

16

2014 WL 2605360, at *3 (S.D. Cal. June 11, 2014); *Dietrich v. Czerniak*, 2007 WL 3046481, at *7 (D. Or. Oct. 7, 2007). The canvass of Manley adopted Abood's description of the plea and the reasons why Manley was entering it, which occurred in Manley's presence and which Manley affirmed was correct. Abood also advised the court that he and Lemcke had gone over the plea agreement very carefully with Manley and that Abood believed Manley understood it and agreed it was in his best interest. In response to questions of the court, Manley affirmed that he understood the charges, had discussed the agreement with counsel, and had read and understood the agreement. Manley affirmed that he had committed each crime charged and that his plea was free and voluntary.

The canvass itself must also be viewed in the context of the plea agreement, which Manley signed. The agreement clearly set forth the charges and the parties' agreement as to the sentence. It also stated that Manley was voluntarily entering his plea and was not doing so on the basis of any promises of leniency by anyone other than the promises set forth in the agreement. (Ex. 19 at 8).

The state courts were not objectively unreasonable in finding the trial court's canvass sufficient to establish that Manley was aware of and understood the charges against him and the possible penalties he faced, that he pled guilty to every charge in exchange for the death penalty being abandoned by the State, and that he was freely and voluntarily entering his plea.

This conclusion stands even in light of Manley's status as a juvenile with cognitive limitations. Two doctors evaluated Manley before he entered his plea. Manley was found competent to understand the proceedings and able to function intellectually,

albeit in borderline territory, without significant psychiatric diagnosis. Manley's attorneys took extra care to discuss and explain the charges and plea to him in light of his cognitive limitations. While Manley uses Dr. Llorente's more recent evaluation in 2011 to cast doubt on his ability to comprehend the plea, an evaluation that took place nine years after the plea was entered is insufficient to rebut the conclusions by two doctors who evaluated Manley contemporaneously with his plea and whose evaluations support a conclusion Manley was competent to enter a plea. Finally, no evidence before either this court or the state courts exists to show that Manley was under the influence of medications that made it impossible for him to knowingly enter a plea. Manley in fact averred in the plea agreement that he was not under the influence of any such substances. (Ex. 19 at 8). In sum, the canvass did not call into doubt the state courts' conclusion that Manley entered his plea knowingly, intelligently and voluntarily and the totality of the circumstances sufficiently supports the state courts' conclusion in this regard.

ii. Ground 1(A)(2)

Manley asserts that he pleaded guilty only because counsel said he would be allowed to withdraw the plea if the law changed to bar execution of juveniles, and thus because his plea was based on this improper promise, it was not knowing and voluntary. (ECF No. 62 at 14). The Nevada Supreme Court addressed this claim as follows:

> Manley contends on appeal that the district court's findings on this matter were erroneous. He asserts that Deputy Public Defender Abood's statements prior to and during the evidentiary hearing regarding the advice he gave Manley about the plea, and whether he could withdraw

it if the law ever changed, . . . were contradictory. He maintains that the district court improperly denied his request to withdraw the guilty plea. We disagree.

. . .

Here, Abood testified at the evidentiary hearing that he sought to place Manley in "the best position possible" to seek to withdraw his guilty plea if the law regarding the execution of juvenile offenders changed and advised Manley that "he could ask to withdraw his plea." But Abood also advised Manley that "there was obviously no guarantees" that he could withdraw his plea. If there had been such a guarantee, Abood continued, it would have been a part of the plea negotiations.

Deputy Public Defender Lemcke testified that she had no specific recollection of whether Manley was told that he could withdraw his plea if the law changed, but she generally corroborated Abood's testimony. And Deputy District Attorney Lalli testified that he "absolutely did not and would not have agreed" to the guilty plea if it was conditioned upon Manley being able to withdraw it if the law changed.

Even if some of Abood's statements and testimony on this matter were inconsistent or unclear, the district court found Abood to be a credible witness, and Abood testified unequivocally that he made "no guarantees" to Manley that he could withdraw his plea if the law regarding the execution of juvenile offenders ever changed. Substantial evidence supports this finding, which includes the testimony of Lemcke and Lalli. And the district court's finding on this matter is not clearly wrong. We therefore defer to it.

(Ex. 65 at 2-3).[4]

In short, the Nevada Supreme Court concluded Abood had not promised Manley could withdraw his plea because Abood denied making such a promise and the trial court found him credible. Manley argues that this conclusion, and the trial court's finding that Abood was credible, were objectively unreasonable.

Manley argues that it is clear that he believed he had been promised he could withdraw his plea if the law were to change. He points to his statements at sentencing, his mother's letter to the

---

[4] Citation is to original page of document.

19

court, his motion to withdraw Abood as counsel, and Abood's letter to Manley that, Manley claims, reflects Manley's understanding. (Exs. 21, 22, 111 & 114). He argues that Abood was the only person who testified that there was no promise and that such testimony ran counter to the testimonies or experiences of everyone else. Finally, he argues, Lemcke and Lalli's testimonies did not support Abood's testimony, contrary to the finding of the state courts.

The state courts were not objectively unreasonable in finding Abood's testimony credible. The State's attorney noted that Abood had not reviewed his notes when he made his initial representation and that Abood had reviewed his notes prior to his sworn testimony in court. The letters written by Manley and his mother amount to self-serving evidence, and Abood's letter reflects only that Manley and his mother were asserting such a promise had been made – not that their assertion was necessarily true. Further, contrary to Manley's assertion, Abood's testimony was in fact supported by that of Lemcke and Lalli. Not only did Lemcke not contradict Abood, she also stated that they never would have promised Manley an absolute right to withdraw. And while Lalli's testimony directly establishes only that Manley never asked the State to guarantee his right to withdraw his plea, it is at least circumstantial evidence suggesting that a guarantee was not part of Abood's discussions with Manley. Finally, while Manley challenges Abood's credibility by alleging that even the advice Abood claims to have given was itself ineffective, as will be discussed *infra*, the advice was not ineffective. The state courts were thus not objectively unreasonable in finding that Abood did not promise

Manley he would be able to withdraw his plea. Manley is not therefore entitled to relief on Ground 1(A)(2) of the petition.

B. Ground Two

Ground Two asserts two claims of ineffective assistance of counsel. First, Manley asserts that counsel failed to advise him of the consequences of the plea. Second, he asserts that counsel failed to sufficiently investigate the extent of his mental impairments. Manley asserts that if counsel had advised him properly of the consequences of the plea and had sufficiently investigated his mental impairments, it is reasonably likely he would have rejected the plea and proceeded to trial or received a better plea deal. (ECF No. 62 at 21-28).

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief—deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* at 696.

1   "We are particularly cautious about second-guessing counsel

2   when a plea is entered." *Hager v. Cate*, 472 Fed. App'x 522, 523

3   (9th Cir. 2012) (citing *Premo v. Moore*, 562 U.S. 115, 131-32

4   (2011)).

5          i. Ground 2(A)

6   Manley asserts that Abood failed to advise him of the

7   consequences of the plea because he incorrectly promised Manley

8   that he could withdraw his plea if the law changed. (ECF No. 62 at

9   22). As the court previously found, the state courts concluded

10  that Abood did not promise Manley that he could withdraw his plea,

11  and their conclusion was not objectively unreasonable.

12  Manley asserts that even if Abood merely told him he would be

13  in a good position to withdraw his plea if the law changed, that

14  advice was ineffective. Any lack of legal precedent to support

15  counsel's advice is not dispositive in the context of this case.

16  There was a very real chance – in counsel's estimation a likely

17  chance – that Manley would be sentenced to death if he went to

18  trial. There was no guarantee that the death penalty for juveniles

19  would be overturned. The only plea agreement the State would agree

20  to was one that put Manley in prison for the rest of his life.

21  With a high chance of death and no possibility of receiving a more

22  favorable plea, there was little Abood could have done to put

23  Manley in a better position than he did. Thus, his advice that, by

24  pleading guilty to the charges agreed to in the plea agreement,

25  Manley was placed in the "best" position, was within the wide range

26  of reasonable representation.

27  Manley has not demonstrated deficient performance and is not

28  therefore entitled to relief on Ground 2(A).

ii. Ground 2(B)

Manley asserts that Abood was also ineffective for failing to adequately investigate the extent of his cognitive defects. (ECF No. 62 at 26). He argues that if counsel had adequately investigated his psychological history and condition, he would not have advised him to enter the plea.

Manley argues that despite Dr. Paglini's recommendation that he receive a full psychological evaluation, the only follow-up evaluation he received was for intellectual functioning. Manley asserts that had Abood done an adequate investigation, he would have discovered that Manley had a history of depression, bipolar disorder, PTSD, chronic drug abuse and physical abuse and neglect. He would also have discovered, as Dr. Llorente concluded, that Manley was unable to understand the consequences of pleading guilty. This information, Manley argues, would have provided powerful mitigation evidence to persuade the State to take the death penalty off the table or to convince the jury not to impose the death penalty, and would have established that Manley could not have knowingly and voluntarily entered a guilty plea.[5]

Respondents argue that counsel had Manley evaluated for competency -- he was found competent -- and for any psychiatric conditions, and none was found. They assert that Manley has not established that any further evaluations would have led to a

---

[5] Manley did not raise this claim until his third state petition, which was dismissed as procedurally barred. Respondents have not moved to dismiss the claim as procedurally defaulted, however, so any procedural default defense is waived, and the court will address the claim on the merits. *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003).

different result – *i.e.*, that he would have rejected the plea and elected to proceed to trial.

When there is no "objective indication" that a defendant has a mental illness or brain damage, we cannot label counsel "ineffective for failing to pursue this avenue of mitigation." *Earp v. Cullen*, 623 F.3d 1065, 1076 (9th Cir. 2010) (quoting *Gonzalez v. Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008)). Counsel had Manley evaluated for competency and then for psychiatric issues and intellectual functioning. Manley was found competent, not mentally retarded, and with no indication of psychiatric issues. Following Dr. Brown's evaluation, there did not remain an objective indicator that further evaluation was necessary. Counsel's failure to further pursue evaluation did not fall outside the wide range of reasonable representation.

Further, most of what Manley argues counsel should have discovered through further evaluation was in fact presented to the court in the motion to dismiss the death penalty charge for a mentally handicapped individual. Manley cannot therefore demonstrate prejudice.

Manley is not entitled to relief on Ground 2(B) of the petition.

C. Ground Four

In Ground Four, Manley asserts that he was denied his right to conflict-free counsel because Abood could not effectively argue for withdrawal of the plea without admitting to his own ineffectiveness – *i.e.*, that he made Manley a false and misleading promise to induce Manley to enter the plea. (ECF No. 62 at 31-35). This claim is procedurally defaulted, and the court previously

reserved on the question of cause and prejudice, which it will now address.

Manley asserts cause based on the Supreme Court case of *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* created a narrow, equitable rule that allows petitioners to, in some cases, establish cause for a procedural default where the failure to raise a substantial claim of ineffective assistance of trial counsel in initial-review collateral proceedings is due to the absence or ineffective assistance of post-conviction counsel. *Id.* at 16-17.

Manley has not demonstrated that postconviction counsel rendered ineffective assistance and thus has not established cause for the default of Ground Four.

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). Postconviction counsel raised the essence of this claim -- that counsel made an improper promise -- in the state habeas petition. There was no greater chance of success on a claim that Abood labored under a conflict of interest because of the improper promise than on the claim that the plea was invalid because of the promise; both depended on the court finding that Abood had made such a promise. Counsel was not therefore deficient in failing to raise this claim in postconviction proceedings. For the same reason, Manley cannot demonstrate prejudice. Because the state courts found Abood had made no such promise, there is no reasonable likelihood the courts would have found that Abood operated under a conflict of interest.

As Manley has not demonstrated cause and prejudice for the default of this claim, Ground Four will be dismissed.

D. Ground Five

In Ground Five, Manley asserts that his Eighth Amendment right to be free from cruel and unusual punishment is violated by his sentence of life without the possibility of parole. (ECF No. 62 at 36).

In *Graham v. Florida*, the Supreme Court held that a sentence of life without parole imposed on a juvenile for a nonhomicide offense is cruel and unusual punishment in violation of the Eighth Amendment. 560 U.S. 48, 82 (2010). Later, in *Miller v. Alabama*, the Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. 460, 465 (2012). It further made clear that "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.* at 473.  *Miller* further held that before imposing a sentence of life without the possibility of parole on a juvenile, a sentencing court must "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

In *Montgomery v. Louisiana*, the Supreme Court held that *Miller* was retroactively applicable on collateral review. 577 U.S. 190 (2016). It also held that "*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 209. However, the Supreme Court recently made clear that sentencing courts are not

26

required to make any specific finding of permanent incorrigibility or any on-the-record explanation with an implicit finding of permanent incorrigibility. *Jones v. Mississippi*, - U.S. -, 141 S. Ct. 1307, 1314-15, 1319-21 (2021). Rather, it is enough that a sentencing court has the discretion to consider "an offender's youth and attendant characteristics" and the discretion to sentence the offender to a term less than life without parole in order to satisfy *Miller*. *Id.* at 1316-18.

Manley alleged in the state courts that his sentence violated *Miller*. Manley argued that his life without parole sentence was mandatory and that he never received an individualized sentencing hearing at which the court considered his youth in determining his sentence.

The Nevada Supreme Court held that there was no mandatory sentencing scheme at the time Manley committed his crimes and thus his sentence was not unconstitutional under *Miller*. (Ex. 153 at 1-2). The court did not address Manley's remaining arguments.

The state courts were not objectively unreasonable in finding that Manley's sentence did not violate the Eighth Amendment. Neither the categorical bar of *Graham* nor the categorial of *Miller* prohibits Manley's sentence. Manley committed two murders and was not sentenced pursuant to a sentencing scheme that mandated life without the possibility of parole.[6] *See* Nev. Rev. Stat. §

---

[6] Manley's argument that his sentence was mandatory because it was pursuant to a binding plea agreement, and because the Nevada Supreme Court's generally refuses to overturn sentences of life without the possibility of parole, is not persuasive. A sentence that is required pursuant to a mandatory sentencing scheme is fundamentally different from a sentence that Manley agreed to and which, although it would have possibly impacted the plea agreement, the court could have deviated from if it had wished. There is no

200.030(4)(b). Moreover, Manley received a sentencing hearing at which the court clearly considered his age in determining his sentence. The court began by stating that Manley was lucky to get the plea he did because "if the Court ever seen a crime that warranted the death sentence, this would be such a crime." (Ex. 21 (Tr. 18)). It then noted Manley's abusive childhood and early drug abuse before stating that "as a juvenile" Manley had received six chances at Probation and had squandered them all. Because of that and the heinous nature of his crimes, the court explained, Manley was, at the age of 17, now facing the rest of his life behind bars. Taken as a whole, the court's statements indicate consideration of the defendant's youth prior to the court's decision to not deviate from the parties' agreed-upon sentence.

As Manley's sentence and the procedure used to arrive at it complies with all relevant Supreme Court precedent, the state courts' rejection of this claim was neither contrary to, nor an unreasonable determination of, clearly established federal law. Manley is not entitled to relief on Ground 5 of the petition.

**IV. Certificate of Appealability**

In order to proceed with an appeal, Manley must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to

authority to support Manley's assertion that appellate decisions have any bearing on the question of whether a sentence is actually, or in effect, mandatory.

warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, Manley has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*

The court has considered the issues raised by Manley, with respect to whether they satisfy the standard for issuance of a certificate of appealability and determines that none meet that standard. Accordingly, Manley will be denied a certificate of appealability.

**V. Conclusion**

In accordance with the foregoing, IT IS THEREFORE ORDERED that the second amended petition for writ of habeas corpus relief (ECF No. 62) is DENIED, and this action is therefore DISMISSED WITH PREJUDICE.

/

/

/

/

/

/

/

/

IT IS FURTHER ORDERED that Manley is DENIED a certificate of appealability, for the reasons set forth above.

The Clerk of Court shall enter final judgment accordingly and close this case.

IT IS SO ORDERED.

DATED: This 27th day of July, 2021.

_____
UNITED STATES DISTRICT JUDGE